## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CHRISTINA KASTANIDIS,** | : | **CIVIL ACTION NO. 1:16-CV-1548** |
| | : | |
| **Plaintiff** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **COMMONWEALTH OF** | : | |
| **PENNSYLVANIA, DEPT. OF** | : | |
| **HUMAN SERVICES,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM

Plaintiff Christina Kastanidis ("Kastanidis") commenced this action against her employer asserting claims for sex discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 ("Title VII"). (See Doc. 1). Defendant Commonwealth of Pennsylvania Department of Human Services[1] ("Department") moves for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Doc. 24).

---

[1] During the relevant time period, the Department of Human Services was known as the Department of Public Welfare. (See Doc. 25 at 2 n.3; Doc. 30 at 1 n.1, ¶ 2). For clarity, the court will refer to defendant as "the Department."

# I. **Factual Background & Procedural History**[2]

Kastanidis worked for several agencies of the Commonwealth of Pennsylvania in various capacities since 2001. The Department first employed Kastanidis in November 2001 in the Lancaster County Assistance Office. (Doc. 25 ¶ 1; Doc. 25-1 at 6). On March 3, 2003, Kastanidis transferred to the Department of Labor and Industry, Office of Adjudication, Workers' Compensation. (See Doc. 25-2 at 28, 46; Doc. 25-3, Kastanidis Dep. 13:25-15:1, Mar. 27, 2017 ("Kastanidis Dep.")).[3] The Commonwealth maintains an anti-sexual harassment policy applicable to all state employees. (See Kastanidis Dep. at 202-03). When she began employment

---

[2] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." LOCAL RULE OF COURT 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues for trial. See id. Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts. (See Docs. 25, 30). To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the statements of material facts.

In addition to providing responses to each paragraph in the Department's statement of material facts, Kastanidis' statement of material facts includes a section styled as "Plaintiff Also Submits The Following Material Facts," consisting of an additional 84 numbered paragraphs. (Doc. 30 at 8). Neither Federal Rule of Civil Procedure 56 nor Local Rule 56.1 authorizes this portion of her filing, and Kastanidis did not request leave of court therefor. Nevertheless, the court has considered and scrutinized this supplemental information as well as the entire record to determine the uncontroverted facts of this matter.

[3] Full deposition transcripts have been filed by the Department as attachments to its statement of material facts. (Doc. 25). Unless otherwise noted, the court will cite to this deposition *passim* as "Kastanidis Dep." without a docket entry citation. The court employs this citation convention for deposition transcripts throughout this memorandum.

with the Department of Labor and Industry in 2003, Kastanidis acknowledged receipt of the Commonwealth's anti-sexual harassment policy and grievance procedure and attended sexual harassment training. (Doc. 25 ¶¶ 3-4; Doc. 25-2 at 30, 34).

On February 11, 2012, the Department hired Kastanidis to serve as administrative assistant to the director of the Bureau of Juvenile Justice Services ("the Bureau"). (Doc. 25 ¶ 5). Andrew Snyder ("Snyder") served as the Bureau's director during Kastanidis' employment therewith. (Id.) Kastanidis avers that the Department failed to provide an anti-sexual harassment policy to her when she assumed the position of administrative assistant. (Doc. 30 ¶ 2). She also claims that she did not sign an acknowledgment form concerning same. (Id. ¶ 3).

### A.    Office Conduct

During approximately four weeks of employment by the Bureau, Kastanidis claims there were multiple instances of inappropriate workplace conduct that contributed to a hostile work environment. The bulk of this conduct took the form of inappropriate jokes and comments by Snyder. (See Kastanidis Dep. 28:8-12). For example, Kastanidis and clerk typist Avery Romain ("Romain") walked to get lunch one afternoon, (id. at 34:17-22; Doc. 25-4, Snyder Dep. 29:19-21, July 31, 2017 ("Snyder Dep."); Doc. 25-7, Phillips Dep. 22:4-12, July 26, 2017 ("Phillips Dep.")), and Snyder drove by, honked his horn, and shouted "are you two dating now? Are you two holding hands?" (Kastanidis Dep. 35:1-12). On another occasion, Snyder, Kastanidis, and a male Bureau field worker waited together for the elevator to exit the building, and Snyder asked Kastanidis and the field worker if they were leaving

together.  (Id. at 35:16-36:4).  When Kastanidis said no, Snyder responded "does [he] need you to walk him to his car?  Are you his bodyguard now?"  (Id. at 36:5-7).  Again Kastanidis replied no, and Snyder allegedly rejoined "[o]h, I'm sure he would want you guarding his body."  (Id. at 36:7-8).

Kastanidis recalls hearing Snyder tell Michelle Phillips ("Phillips"), the director of the Bureau's Division of Health Services, not to "get [her] underwear in a bunch."  (Id. at 36:21-23; Doc. 25-2 at 23).  Snyder then purportedly said to Phillips "[o]h that's right, you wear . . . those old granny underwear."  (Kastanidis Dep. 36:23-25).  Phillips testified that Snyder and another director made the comment about her "granny panties" when she reached for a piece of paper and the top of her briefs were momentarily exposed.  (Phillips Dep. 67:14-68:3).  Kastanidis was offended by how Snyder spoke about other office employees.  (Kastanidis Dep. 37:5).  Snyder allegedly demeaned male and female coworkers frequently, and Kastanidis recalled him describing multiple employees as "asshole[s]" and once referring to a female employee as a "bitch."  (Id. at 37:6-13).  He frequently told a story about facility financial manager Elizabeth Henry ("Henry") waking up wearing Snyder's pants after an evening of drinking with him.  (Id. at 135:2-14; Snyder Dep. 197:19-198:13).

Kastanidis ate lunch in the Bureau's breakroom intermittently.  (Kastanidis Dep. 29:15-19).  One afternoon, Kastanidis, Snyder, and Romain ate lunch in the breakroom as an episode of "The Voice" played on the television.  (Id. at 29:19-24; Snyder Dep. 180:25).  Kastanidis commented that the show was "okay" and Snyder reportedly responded "it doesn't matter what you think because . . . [the hostess's]

tits are right there . . . they're right in your face the whole time." (Kastanidis Dep. 30:1-8). Snyder denies ever using that word and avers that he actually said the hostess "needs to cover up because it is hard to watch that TV show with as much cleavage as she has out." (Snyder Dep. 180:25-181:11). On another occasion in the breakroom, Kastanidis inquired as to the proper attire for a meeting Snyder asked her to attend. (Kastanidis Dep. 30:9-20). Snyder allegedly turned to Romain, chuckled, and replied that she should wear "buttless chaps." (Id. at 30:20-24). Kastanidis claims that Snyder made racial slurs in the breakroom and stated that she "never worked in a professional environment" in which such expletives as "bitch," "fuck," and "tits," were so "openly spoken." (Id. at 31:5-15; Doc. 25 ¶ 10).

Snyder instructed Kastanidis to assist Romain in assembling paperwork and packets of literature for a regional directors meeting because Romain would "fuck it up." (Kastanidis Dep. 38:1-9). Some contributing employees failed to submit their materials to Kastanidis on time. (Id. at 38:11-15, 64:6-65:17). When Snyder discovered mistakes in the way packets were assembled, he became frustrated and asked Kastanidis "what's wrong with you?" and said "even an idiot could do this." (Id. at 39:22-23, 40:1-2).

Kastanidis attended weekly conference calls about at-risk youth with Snyder and various directors and facilities managers. (Id. at 40:12-41:4). Following a report of alleged sexual abuse of juveniles by facility personnel, Snyder allegedly commented that "[t]hey were asking for it." (Id. at 41:12-42:2). On a separate occasion, Kastanidis struggled to recall a name and stated "it's on the tip of my tongue." (Id. at 43:16-24). Snyder responded "speaking of on the tip of your

tongue." (Id. at 43:25-44:1).  Kastanidis was offended and disgusted by Snyder's comment.  (Id. at 44:1-10).

In another incident, Snyder directed Kastanidis to purchase dictation equipment worth several hundred dollars using the Department credit card.  (Id. at 51:15-24).  Kastanidis testified that Snyder said "if there's a problem with approval or anything, you don't take no for an answer . . . you're my girl and don't let anyone tell you no." (Id. at 51:25-52:2).  She felt that comment was inappropriate.  (Id. at 52:8-10).  Snyder denies saying "you're my girl." (Snyder Dep. 181:15-18).  Snyder once offered to drive Kastanidis to her car.  (Doc. 25 ¶ 12). Kastanidis felt Snyder's offer was inappropriate and unnecessary since she parked only a block from work, but recognizes it might have been simply a kind gesture. (Kastanidis Dep. 45:16-46:10).  Kastanidis felt uncomfortable with Snyder's physical proximity to her personal space at least once, but there is no evidence Snyder ever touched or placed his hands on her.  (Doc. 25 ¶¶ 6, 8, 25).

Kastanidis received an email early in her tenure as Snyder's administrative assistant from Nick Barelet ("Barelet"), a program specialist supervisor, shortly before Barelet left the Bureau.  (Kastanidis Dep. 32:2-9, 33:12-14, 34:4-9; Snyder Dep. 139:6-11).  Barelet allegedly offered to assist Kastanidis with directions around the area in the event of a detour, accident, or traffic.  (Kastanidis Dep. 33:14-18).  In describing what routes to take, Barelet referenced traveling "under a bridge" and offered to take Kastanidis for a ride to show her the route.  (Id. at 33:19-24). Kastanidis forwarded Barelet's email to Snyder who allegedly told Kastanidis that she "must have given [Barelet] vibes." (Id. at 33:25-34:3).  When Kastanidis denied

giving Barelet "anything," Snyder replied "well, you must have given him something . . . perhaps an STD." (Id. at 34:4-7). Snyder refutes making this comment. (Snyder Dep. 181:12-14).

After Kastanidis forwarded the email to Snyder, he responded by email that he would "take care of [Barelet]" and "take care of the situation." (Kastanidis Dep. 42:11-14). Snyder forwarded the Barelet email to the director of the Bureau's Division of Administration and Quality Improvement. (Id. at 42:15-16; Doc. 25-2 at 23). Kastanidis avers that Snyder brought the email up at the weekly director's meeting and pointed out to everyone that "[Barelet] wanted to take [her] under the bridge" and that Kastanidis must have "done something to encourage [Barelet to] com[e] back." (Kastanidis Dep. 42:17-24). She claimed that Snyder portrayed the situation as "a rendezvous with [Barelet] under the bridge." (Id. at 42:24-43:1).

## B.   Statewide Director's Meeting

At Snyder's direction, Kastanidis attended a three-day, statewide director's meeting in Danville, Pennsylvania in early March 2012. (Doc. 25 ¶ 14; Doc. 30 ¶ 14). Snyder and Kastanidis traveled together in his government vehicle. (Doc. 25 ¶ 15). Snyder allegedly pointed out a sign for the gentlemen's club Mustang Sally's to Kastanidis during the drive to the meeting. (Kastanidis Dep. 86:18-23, 87:6-9; see also Doc. 25-8, Gregor Dep. 90:1-5, June 8, 2017 ("Gregor Dep.")). Snyder disputes this allegation, adding that Mustang Sally's is not along the route he and Kastanidis took to Danville. (Snyder Dep. 171:6-22, 172:8-9).

Snyder indicated during the car ride that at these conferences, people usually get together in the evenings to drink and socialize in the hotel rooms.

(Kastanidis Dep. 82:3-7). Snyder then shared a story about a past overnight conference he attended with his former supervisor. (Id. at 81:22-82:12). Snyder stated that his supervisor invited him to her hotel room and attempted to sleep with him. (Id. at 82:12-83:4). Kastanidis claims that Snyder said this kind of behavior is not uncommon at these overnight meetings and that "bosses do sleep with their assistants." (Id. at 83:5-14). Snyder allegedly said that he "could see that happening to a very attractive woman like Ms. Kastanidis." (Doc. 33 at 23). Kastanidis retorted that she wanted Snyder to be proud of the work she did as his assistant but that she would not sleep with him. (Kastanidis Dep. at 84:9-11).

Snyder disputes Kastanidis' claim that he was trying to seduce her in the car. (Snyder Dep. 173:1-10). According to Snyder, the Barelet email came up during the ride to Danville and Snyder inquired whether Kastanidis wanted him "to go anywhere with it." (Id. at 138:5-12, 139:2-18). Snyder maintains that Kastanidis declined his offer to help but agreed that Barelet's email was inappropriate. (Id. at 138:7-15, 139:14-18). Kastanidis also purportedly shared that she had been sexually harassed almost every day at her previous job. (Id. at 139:19-22). Snyder avers that he told the story of his female supervisor sexually harassing him in the hotel room years ago as a way to connect with Kastanidis. (Id. at 138:16, 139:22-140:18). He allegedly explained to Kastanidis that he struggled to work with his former supervisor after that incident and that Kastanidis was "going to be okay in this office." (Id. at 140:20-24).

En route to Danville, Snyder and Kastanidis stopped at a facility for female juveniles for a meeting to secure additional after-care program funding. (Kastanidis

Dep. 88:16-89:18, 90:5-19). At the facility, Kastanidis overheard Snyder speaking with two male managers about a female juvenile who had been rehabilitated and reintegrated back into her community. (Id. at 90:24-91:3). The men were discussing the juvenile's report to her probation officer that facility workers "forced . . . the female juveniles . . . to perform oral sex and have sex with the workers." (Id. at 91:19-24). Snyder allegedly joked to the male managers that "we don't pay them to have sex with [the workers,] [t]hey have sex with us for free," referring to the female juveniles. (Doc. 25 ¶ 16).

After arriving at the hotel, Kastanidis attended a retirement dinner at a nearby restaurant for facility maintenance manager Dean Fetterholf at Snyder's insistence. (Id. ¶ 17; Doc. 30 ¶ 17; Doc. 25-2 at 25). Snyder allegedly introduced Kastanidis by saying "[s]peaking of naked women, Christina, come here, I wanted to introduce you to [Mr. Fetterholf]." (Doc. 25 ¶ 18; Doc. 30 ¶ 18 & n.6). Later that evening, Russell Zemanek ("Zemanek"), director of the Bureau's Division of Program and Employee Development, beckoned Kastanidis to the restaurant's bar area. (Kastanidis Dep. 103:16-104:5; Doc. 25-2 at 23). At the bar, Snyder introduced Kastanidis to the Department's deputy secretary, Richard Gold ("Gold"). (Kastanidis Dep. 104:10-13; Snyder Dep. 216:21-217:6; Doc. 25-9, Lutinski Dep. 90:12-15, Aug. 11, 2017 ("Lutinski Dep.")). Gold purportedly "walked around [Kastanidis] looking her up and down" and exclaimed "holy fucking shit. . . . What did you say when you saw her, Andy? Hire, hire, hire." (Gregor Dep. 75:9-13; Kastanidis Dep. 104:10-19; cf. Lutinski Dep. 90:15-19). Gold then said "welcome aboard" to Kastanidis and informed her that "[Snyder] is impotent." (Kastanidis

Dep. 105:2-4; Gregor Dep. 75:13-14). Human resources officer Daniel Lutinski witnessed this exchange between Kastanidis, Synder, and Gold. (Lutinski Dep. 90:12-91:8, 91:21-92:9). Kastanidis felt trapped at the bar surrounded by Zemanek, Snyder, and Gold. (Kastanidis Dep. 105:5-23). She drove back to the hotel with coworkers over Snyder's objection. (Id. at 106:7-107:16).

The following morning, Kastanidis attended the conference and transcribed the various meetings. (Id. at 111:25-113:12). Kastanidis found herself in a small group of coworkers and overheard Snyder making comments about Mustang Sally's in front of multiple employees including Lutinski. (Id. at 122:23-123:9; Lutinski Dep. 72:16-73:1; Gregor Dep. 90:8-10, 90:22-91:5). Snyder purportedly described in detail to the group that a man could signal to a woman what he wanted based on the location and manner in which he placed dollar bills in her clothing. (Kastanidis Dep. 123:11-23; Lutinski Dep. 73:2-8; Gregor Dep. 90:8-18). Snyder acknowledged that he may have made this joke but maintained that he has never been to Mustang Sally's. (Snyder Dep. 171:23-172:19). Kastanidis recalled Snyder inviting her to his hotel room after the day's meetings to have a few drinks with coworkers. (Kastanidis Dep. 116:15-17). Kastanidis declined the invitation and retired to her own hotel room to relax before dinner. (Id. at 117:8-17, 118:8-23).

Kastanidis went to dinner with several Bureau employees and agreed to bring food back to Snyder's room for him and two coworkers. (Id. at 124:17-18, 126:17-127:15; Gregor Dep. 93:17-94:10; Doc. 25-5, Naugle Dep. 58:5-21, 67:4-12, July 11, 2017 ("Naugle Dep.")). During dinner, Kastanidis mentioned to multiple directors that Snyder made inappropriate comments on the car ride to Danville.

(Naugle Dep. 64:16-65:5; Gregor Dep. 92:6-93:1). Phillips accompanied Kastanidis to drop the food off at Snyder's hotel room. (Kastanidis Dep. 128:24-129:7). Many of Kastanidis' coworkers were drinking and socializing in Snyder's room when she arrived. (Id. at 129:8-131:15). Kastanidis stayed briefly but did not drink. (Id. at 131:13-22, 135:18-136:1). She claims Snyder repeated a coworker's comment that Henry has "the most perfect breasts." (Doc. 25-2 at 5). Snyder teased Kastanidis about her involvement in martial arts and encouraged her to arm wrestle with a male coworker. (Kastanidis Dep. 134:1-12; Lutinski Dep. 59:3-5). Snyder allegedly mouthed "karate [] bitch" to Kastanidis. (Kastanidis Dep. 134:12-15). Kastanidis returned to her hotel room, called her fiancé, and confided that "something's wrong" and that she could not ride home with Snyder. (Id. at 137:21, 138:16-18). She asked Phillips for a ride back to Harrisburg, and they agreed to discuss the situation over coffee in the morning. (Id. at 139:22-23, 141:2-5).

After checking out of the hotel, Bureau employees attended a training session at a secure treatment facility before returning to Harrisburg. (Id. at 144:2-4). Kastanidis met Phillips in the hotel lobby and informed Snyder that she would be riding with Phillips to the training session. (Id. at 141:19, 142:21-23). Following the training, Phillips agreed to give Kastanidis a ride back to Harrisburg. (Id. at 147:21-22, 148:9-13). As Kastanidis waited by the car, she heard Snyder yelling at Phillips inside the secure treatment facility. (Id. at 145:4-21; Phillips Dep. 131:7-132:11). Snyder expressed frustration that Kastanidis chose to ride home with Phillips by "pounding the table" and exclaiming at Phillips "I'm not happy with you. Do you understand that? Do you understand that you're wrong?" (Phillips

Dep. 131:14-132:6; Snyder Dep. 62:15-20; Naugle Dep. 72:19-74:24; Gregor Dep. 102:6-9).  Lutinski witnessed Snyder's outburst but did not step in to address the situation.  (Phillips Dep. 132:1-133:23).

Snyder admits he was upset with Phillips for interfering in his efforts to get to know Kastanidis and "gauge whether she [could] do [the] job," but he denies yelling or screaming.  (Snyder Dep. 64:4-20; Gregor Dep. 102:6-9).  Despite his claim that Phillips contravened his earlier instruction that Kastanidis was to address any issues with him directly, Snyder chose not to force Kastanidis to drive home with him.  (Kastanidis Dep. 64:17-24).  Kastanidis was "panic stricken and anxious, nervous, [and] horrified" at the prospect of riding back with Snyder.  (Id. at 148:9-13).  Phillips and Kastanidis left the facility together in Phillips's car.  (Id. at 149:5-7).

### C.  Right of Return

When Phillips stopped for gas on the drive back to Harrisburg, Kastanidis called Sue Emswiler ("Emswiler"), her former union steward.  (Id. at 151:2-10).  Kastanidis sought Emswiler's advice because she was unsure of what to do under the circumstances.  (Id. at 151:3-5, 151:18-21).  Emswiler informed Kastanidis that she had a limited period of time in which to exercise her right to return to her previous position with the Department of Labor and Industry.[4]  (Id. at 160:22-161:4).  Kastanidis emailed Snyder and Lutinski when she returned from Danville on

---

[4] Following a promotion, Pennsylvania law permits the promoted employee to exercise "the option to return to the position [he or she] previously held" anytime during the first three months of that employee's probationary period.  71 PA. STAT. AND CONS. STAT. ANN. § 741.804a(b); (see also Kastanidis Dep. 157:13-18).

Friday afternoon, March 9, 2012, to inform Snyder that she was exercising her right to return to her previous position. (Doc. 25 ¶ 22; <u>see also</u> Doc. 33 at 19; Kastanidis Dep. 152:10-154:23). Approximately five minutes later, Zemanek called Kastanidis into his office to take a phone call from Snyder. (Kastanidis Dep. 48:20-49:13). Snyder asked Kastanidis if they could talk about her request, but she refused and indicated she preferred to wait until Monday. (<u>Id.</u> at 49:17-24). Snyder asked Kastanidis if he could have her cell phone number so they could speak or meet over the weekend. (Doc. 25 ¶ 11; Kastanidis Dep. 50:1-2, 50:14-16). Kastanidis again declined. (Kastanidis Dep. 50:2, 50:17). She reported the alleged sexual harassment to union representative Tara Caughey ("Caughey") over the weekend. (Doc. 25 ¶ 28).

Kastanidis reported for work on Monday, March 12, 2012 and met with Snyder in his office. (Kastanidis Dep. 158:20-25). Snyder inquired as to why Kastanidis exercised her right to return to her previous position. (<u>Id.</u> at 159:1-4). Kastanidis provided no details and only responded "you know what you're doing" each time Snyder asked for an explanation. (<u>Id.</u> at 159:9-25; Snyder Dep. 115:3-9). Snyder encouraged Kastanidis to take some time to reconsider her decision and offered to correct any issues Kastanidis was willing to bring to his attention. (Kastanidis Dep. 160:6-12; Snyder Dep. 115:3-8, 115:15-22). Kastanidis used paid leave for her last week at the Bureau and returned to her previous position at the Department of Labor and Industry on March 17, 2012. (Doc. 25 ¶¶ 24, 29).

### D.     Investigation

Kastanidis testified that she did not "have an understanding" of the process for filing a sexual harassment complaint prior to her initial conversations with Emswiler and Caughey.  (Kastanidis Dep. 173:11-14).  After returning to the Department of Labor and Industry, union representatives instructed Kastanidis to file a formal complaint against Snyder.  (Id. at 173:14-175:4).  Kastanidis participated in two extensive telephone interviews with human resources employees on March 23, 2012 and provided details regarding her allegations against Snyder.  (Doc. 25 ¶ 31; Doc. 25-2 at 2).  The Department interviewed Snyder on March 27, 2012 and suspended him pending further investigation.  (Doc. 25 ¶¶ 32-33).  On March 30, 2012, Kastanidis emailed a formal complaint against Snyder to the director of the Department's Bureau of Equal Opportunity.  (Id. ¶ 34).

The investigation revealed that many female Bureau employees, including two directors, feared Snyder would retaliate if they reported his sexually harassing conduct.  (Doc. 25-2 at 19).  Multiple women left the Bureau due to the allegedly hostile workplace atmosphere.  (Phillips Dep. 79:14-17, 79:25-80:11, 154:13-155:5).  One female employee stopped eating lunch in the breakroom to avoid the offensive conversations between Snyder and other male employees.  (Doc. 25-6, Hinckley Dep. 30:21-31:10, July 11, 2017 ("Hinckley Dep.")).  During the same time period that Kastanidis worked for Snyder, Phillips informed a human resources employee that she "didn't know how much more [she] could work" at the Bureau.  (Phillips Dep. 200:5-16).  According to a former acting director, "there was no one to complain to" about working conditions within the Bureau and the filing of a formal complaint

was "the kiss of death to your career." (Gregor Dep. 128:3-8, 128:19-129:1).

Kastanidis received an email from Jenny Naugle, a juvenile justice facility program director, thanking her for reporting Snyder's behavior. (Naugle Dep. 6:23-7:7, 22:19-23:10; Doc. 25-2 at 23).

The investigation team concluded that Snyder had "engaged in conduct that created an intimidating, hostile, or offensive work environment." (Doc. 25-2 at 51; see also id. at 2-22). The Department terminated Snyder's employment effective June 20, 2012. (Id. at 51). Following an appeal and a settlement agreement, Snyder was reinstated but demoted to an income maintenance caseworker. (Snyder Dep. 164:10-165:2, 166:18-167:15). Snyder's disciplinary suspension from March 28, 2012 through June 19, 2012 remained in effect, but he received back pay for the period of his termination: June 20, 2012 to January 3, 2013. (Id. at 165:6-166:10; see also Doc. 33 at 22).

### E. Procedural History

Kastanidis filed this action in the Eastern District of Pennsylvania against the Department asserting two claims of sex discrimination in the workplace in violation of Title VII. The court granted the Department's motion to transfer venue to the Middle District of Pennsylvania. The Department moves for summary judgment on both claims. The motion is fully briefed and ripe for disposition.

## II. <u>Legal Standard</u>

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality. FED. R. CIV. P. 56(a). The burden of

proof tasks the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. <u>Pappas v. City of Lebanon</u>, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); <u>see</u> <u>also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250-57 (1986); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-89 (1986). Only if this threshold is met may the cause of action proceed. <u>See</u> <u>Pappas</u>, 331 F. Supp. 2d at 315.

**III.**   <u>**Discussion**</u>

Kastanidis brings two claims for sex discrimination in the workplace in violation of Title VII, arguing that she suffered sexual harassment which (1) created a hostile work environment and (2) resulted in her constructive discharge. The Department avers that the alleged discrimination was not sufficiently severe or pervasive to constitute a hostile work environment nor would it detrimentally affect a reasonable person in similar circumstances. It also contends that Kastanidis cannot establish *respondeat* superior liability. As to the constructive discharge claim, the Department argues that any discriminatory conditions in the workplace were not so intolerable as to cause a reasonable person subject to those conditions to resign. We begin with Kastanidis' hostile work environment claim.

**A.**   **Hostile Work Environment**

Under Title VII, an employer may not "discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Title

VII reaches not just economic or tangible discrimination, but prohibits sexual harassment that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)); Mandel v. M & Q Packaging Corp., 706 F.3d 157, 167 (3d Cir. 2013). To prevail on a hostile work environment claim against an employer, an employee must prove that (1) he or she suffered intentional discrimination on the basis of sex, (2) the discrimination was severe or pervasive, (3) he or she was detrimentally affected by the discrimination, (4) such discrimination would detrimentally affect a reasonable person in similar circumstances, and (5) the existence of *respondeat superior* liability. Mandel, 706 F.3d at 167 (citation omitted).

The Department does not contest that the alleged conduct was directed toward Kastanidis because of her sex or that she was detrimentally affected by the alleged conduct. We will address the remaining three elements of Kastanidis' hostile work environment claim *seriatim*.

### 1. *Severe or Pervasive*

A plaintiff must establish that the discrimination was "severe *or* pervasive." Castleberry v. STI Grp., 863 F.3d 259, 264 (3d Cir. 2017). Generally, an isolated incident will not amount to harassment unless it is "extremely serious." Id. at 264-65 (quoting Jensen v. Potter, 435 F.3d 444, 449 n.3 (3d Cir. 2006) overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006)). Less objectionable conduct must be pervasive to contaminate the workplace. Id. at 264 (quoting Jensen, 435 F.3d at 449 n.3). Courts must consider

the totality of the circumstances in determining whether a work environment is hostile. Id.; Mandel, 706 F.3d at 168. Relevant factors include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Castleberry, 863 F.3d at 264 (quoting Harris, 510 U.S. at 23); Mandel, 706 F.3d at 168 (same).

Adequate evidence supports that Kastanidis experienced pervasive discriminatory harassment during her employment with the Bureau. Snyder humiliated Kastanidis in front of Bureau employees by insinuating she wanted or pursued sexual relationships with coworkers. (See, e.g., Kastanidis Dep. 34:3-7, 35:1-12, 36:5-8, 42:17-24). Kastanidis was frequently the target of Snyder's sexually charged jokes. (See, e.g., id. at 30:20-24, 43:16-44:1; Doc. 25 ¶ 18). Snyder strongly intimated that Kastanidis should sleep with him on their commute to Danville. (Kastanidis Dep. 83:5-14, 86:18-23, 87:6-9; Doc. 33 at 23). As a result of this conduct, Kastanidis feared for her safety and was generally afraid of Snyder. (Kastanidis Dep. 83:15-84:4, 85:15-17, 86:24-87:2, 117:11-14). She felt uncomfortable with Snyder's proximity to her personal space. (Doc. 25 ¶ 6).

The Department contends that these isolated incidents amount to nothing more than offensive utterances. (Doc. 26 at 7-11). But the frequency of Snyder's harassing conduct over a mere four weeks, when viewed in its totality, suggests otherwise. Snyder's discriminatory conduct permeated the workplace at the Bureau. He frequently insulted women in Kastanidis' presence, calling them disparaging names, mocking their clothing choices, and commenting on their

anatomy. (Kastanidis Dep. 29:19-30:8, 36:23-25, 37:5-13, 123:11-23, 134:12-15, 135:2-14; Doc. 25-2 at 5). During a discussion about abuse of female juveniles at the hands of Bureau employees, Snyder suggested they were "asking for it." (Kastanidis Dep. 41:12-42:2; Doc. 25 ¶ 16). Kastanidis was disgusted and sickened by his comments—and she was not alone in that reaction. (See Kastanidis Dep. 42:2-4, 94:22). Snyder's conduct also impeded Kastanidis' ability to function in the workplace. (Id. at 117:11-14). Kastanidis described feeling extremely uncomfortable and offended at Snyder's jokes and mockery. (Id. at 31:11-13, 36:9-11, 37:5, 44:5-10, 62:12-17, 148:14-19). Snyder's perceived sexual advances caused Kastanidis great distress. (See, e.g., id. at 85:11-17, 152:23-153:5). On this Rule 56 record, we conclude with little difficulty that a reasonable jury could find that Kastanidis experienced sexual harassment so pervasive as to transform the conditions of her employment into a hostile work environment.

## 2. *Reasonable Person*

An objectively reasonable person in Kastanidis' position might be detrimentally affected by Snyder's harassing and discriminatory behavior. Record evidence reasonably supports the proposition that multiple women left the Bureau due to the hostile workplace atmosphere. (Phillips Dep. 79:14-17, 79:25-80:11, 154:13-155:5). Female Bureau employees feared retaliation from Snyder if they reported his conduct, and Phillips told a human resources employee that she "didn't know how much more [she] could work." (Doc. 25-2 at 19; Phillips Dep. 200:5-16). At least one female employee stopped eating lunch in the breakroom because of the offensive nature of the conversation by Snyder and other male

employees.  (Hinckley Dep. 30:21-31:10).  After Kastanidis left the Bureau, Naugle

emailed Kastanidis to thank her for reporting Snyder's behavior.  (Naugle Dep.

22:19-23:10).  The record contains sufficient evidence such that a reasonable jury

could conclude that the alleged sexual harassment at the Bureau was objectively

offensive.

### 3.      *Respondeat Superior Liability*[5]

Hostile work environment claims present in two categories: harassment that

"culminates in a tangible employment action" and harassment that occurs "in the

absence of a tangible employment action."  <u>Pa. State Police v. Suders</u>, 542 U.S. 129,

143 (2004) (quoting <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 765 (1998)) (citing

<u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 807-08 (1998)).  An employer is strictly

liable for harassment of an employee by his or her supervisor when the harassment

culminates in an official employment action.  <u>Jones v. SEPTA</u>, 796 F.3d 323, 328 (3d

Cir. 2015) (quoting <u>Suders</u>, 542 U.S. at 143).  Tangible employment actions include

"hiring, firing, failing to promote, reassignment with significantly different

responsibilities, or a decision causing a significant change in benefits."  <u>Minarsky</u>

---

[5] Kastanidis argues that the Department is directly liable for Snyder's
harassing behavior because it was negligent appertaining that behavior.  (Doc. 32
at 20-23).  An employer may be held directly liable for sexual harassment
perpetrated by the victim's non-supervisory coworker "only if the employer failed to
provide a reasonable avenue for complaint or, alternatively, if the employer knew or
should have known of the harassment and failed to take prompt and appropriate
remedial action."  <u>Huston v. Procter & Gamble Paper Prods. Corp.</u>, 568 F.3d 100,
104-05 (3d Cir. 2009); <u>see</u> <u>also</u> <u>Vance v. Ball State Univ.</u>, 570 U.S. 421, 427 & n.1
(2013).  When the harassing employee is the plaintiff's supervisor, the plaintiff must
establish the employer's vicarious liability.  <u>Vance</u>, 570 U.S. at 427; <u>Huston</u>, 568 F.3d
at 104.  It is undisputed that Snyder was Kastanidis' direct supervisor.  (Doc. 25 ¶ 5;
Doc. 1 ¶ 9).

v. Susquehanna County, __ F.3d __, 2018 WL 3234243, at *4 (3d Cir. 2018) (quoting Ellerth, 524 U.S. at 761).

An employer may assert the Ellerth-Faragher affirmative defense to avoid liability when harassment occurs in the absence of an official act. Minarsky, 2018 WL 3234243, at *5; Jones, 796 F.3d at 328 (quoting Suders, 542 U.S. at 143). An employer may raise this affirmative defense to liability by showing that (1) it exercised reasonable care to prevent and promptly eliminate harassing behavior, and (2) the plaintiff unreasonably failed to "take advantage of the employer's safeguards" and otherwise take mitigating action to avoid harm. Jones, 796 F.3d at 328 (quoting Faragher, 524 U.S. at 805); see also Suders, 542 U.S. at 152. The existence of a "functioning anti-harassment policy *could* prove" that the employer exercised reasonable care. Minarsky, 2018 WL 3234243 at *5 (citing Faragher, 524 U.S. at 807). Evidence that an employee "failed to [exercise] reasonable care to avoid harm" will typically satisfy the employer's burden under element two of the Ellerth-Faragher affirmative defense. Id. (alteration in original) (quoting Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 765).

The Commonwealth's anti-sexual harassment policy governs all its departments. (Kastanidis Dep. at 202-03). The policy prohibits sexual harassment in the workplace and provides contact information for several agencies to which an employee can file a complaint directly. (Id. at 203). Under the policy, managers and other supervisory employees bear responsibility for preventing and addressing sexual harassment. (Id. at 202).

The Department avers that it exercised reasonable care by maintaining an anti-sexual harassment policy and grievance procedure, promptly investigating Kastanidis' allegations, and taking swift corrective action against Snyder. (See, e.g., Doc. 26 at 28). The Department timely responded to Kastanidis' complaint, conducted an investigation, and imposed sanctions on Snyder. (Doc. 25 ¶¶ 32-34; Doc. 25-2 at 2-22, 51). However, the record raises genuine questions as to whether the Department exercised reasonable care in preventing the workplace sexual harassment in the first instance. Snyder sexually harassed Kastanidis in front of other supervisory directors within the Bureau. (See, e.g., Kastanidis Dep. 42:17-43:1; Doc. 25 ¶ 18). Bureau employees, including at least two directors, feared Snyder might retaliate against them if they complained about his conduct. (Doc. 25-2 at 19). Human resources employee Lutinski witnessed multiple incidents of harassment prior to Kastanidis' complaint and failed to take any corrective action. (See Lutinski Dep. 72:16-73:22, 77:3-15, 90:12-91:8, 91:21-92:9; Phillips Dep. 78:12-17, 132:1-133:23). Based on this evidence, a reasonable jury could conclude that the Department did not exercise reasonable care in preventing *and* addressing the sexually harassing behavior occurring in the Bureau.

The Department also argues that Kastanidis unreasonably failed to utilize its grievance procedure such that the Department was unable to timely address the sexual harassment. (Doc. 26 at 15-16, 19-21). The mere failure to report sexual harassment "is not *per se* unreasonable." Minarsky, 2018 WL 3234243, at *8. A jury might view Kastanidis' failure to report the sexual harassment until after leaving the Bureau as objectively reasonable. Kastanidis acknowledged receipt of a sexual

harassment policy and grievance procedure in 2003 when she first took employment with the Department of Labor and Industry, (Doc. 25 ¶ 3; Doc. 25-2 at 30, 34), and she also attended sexual harassment training at that time, (Doc. 25 ¶ 4). But the record is devoid of any evidence that Kastanidis received this information from the Department at any time in the intervening nine years. (See Doc. 30 ¶¶ 2-3).

Kastanidis also claims she did not "have an understanding" of the process for filing a sexual harassment grievance within the Department. (Kastanidis Dep. 173:11-14). Following the Danville conference, Kastanidis called the only resource she knew, a former union steward from her time at the Lancaster County Assistance Office. (Id. at 151:3-21). The Rule 56 record reflects that several Bureau directors with supervisory authority and human resources personnel were made aware of Snyder's conduct—both through reports and their own observations—yet no action was taken to assist Kastanidis. (See Gregor Dep. 92:6-93:1, 128:3-8, 128:19-129:1; Lutinski Dep. 72:16-73:22, 77:3-15, 90:12-91:8, 91:21-92:9; Naugle Dep. 64:16-65:5; Phillips Dep. 78:12-17, 132:1-133:23). Over time, Kastanidis came to believe that the toxic work environment was "normal" for her coworkers. (Kastanidis Dep. 106:2-3). Assuming *arguendo* that Kastanidis understood the anti-sexual harassment policy and related grievance procedures, a jury could conclude that Kastanidis reasonably believed that availing herself of those procedures would be futile. Kastanidis' hostile work environment sex discrimination claim survives Rule 56 scrutiny.

### B. Constructive Discharge

Sexual harassment or hostility is actionable under Title VII upon a showing that the offending behavior was "sufficiently severe or pervasive" so as to alter conditions of a plaintiff's employment and "create an abusive working environment." Suders, 542 U.S. at 146-47 (quoting Meritor, 477 U.S. at 67). To sustain a compound claim for "hostile-environment constructive discharge," a plaintiff must also show "working conditions so intolerable that a reasonable person would have felt compelled to resign." Id. at 141, 147. The decision to resign must be "reasonable given the totality of the circumstances." Suders v. Easton, 325 F.3d 432, 445 (3d Cir. 2003), vacated on other grounds part sub nom. Suders, 542 U.S. 129.

A claim for constructive discharge is, by its nature, "a heavily fact-driven determination." Id. at 446 (quoting Levendos v. Stern Entm't, Inc., 860 F.2d 1227, 1230 (3d Cir. 1988)). As noted supra, record evidence supports the proposition that female employees left the Bureau after experiencing a hostile work environment and others feared retaliation if they reported Snyder's behavior. (See Doc. 25-2 at 19; Phillips Dep. 79:14-17, 79:25-80:11, 154:13-155:5). Moreover, genuine questions remain as to whether the Department exercised reasonable care in preventing and addressing the workplace sexual harassment. (See Kastanidis Dep. 42:17-43:1; Lutinski Dep. 72:16-73:22, 77:3-15, 90:12-91:8, 91:21-92:9; Phillips Dep. 78:12-17, 132:1-133:23; Doc. 25 ¶ 18). A jury that concludes a plaintiff was victimized by a hostile work environment may also reasonably find that "the hostile work environment was severe enough to have precipitated [the plaintiff's] resignation, i.e., a constructive discharge." Cardenas v. Massey, 269 F.3d 251, 267 (3d Cir. 2001).

Kastanidis has adduced sufficient evidence to meet her summary judgment burden as to her constructive discharge claim.

## IV.   __Conclusion__

The court will deny the Department's motion for summary judgment.  An appropriate order shall issue.


/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania


Dated:    July 26, 2018